FILED

2025 Mar-26  PM 12:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **PHILIPPE ZOGBE ZATTA,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **Case No.: 5:21-cv-01707-MHH** |
| **SCI TECHNOLOGY INC.,** *et al.*, | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION AND ORDER

In his amended complaint, *pro se* plaintiff Philippe Zogbe Zatta asserts claims under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. (Doc. 104). He has sued SCI Technology Inc., Sanmina Corp., AllStates Consulting Services, LLC, Coretech, LLC, and Fusion Solutions, Inc. (Doc. 104). SCI and Sanmina have answered. (Doc. 108). AllStates has filed a motion to dismiss. (Doc. 112).[1] Dr. Zatta has asked the Court to take judicial notice of the reasons why he has not served Coretech and Fusion. (Doc. 117). This opinion addresses the pending motion and Dr. Zatta's request regarding service.

---

[1] AllStates filed Doc. 112, its amended motion to dismiss, the same day that it filed another motion to dismiss, Doc. 111. Because AllStates amended its motion to dismiss, the Court denied AllStates's motion to dismiss in Doc. 111 as moot. (Doc. 113).

# I.

Rule 12(b)(6) allows a defendant to move to dismiss claims within a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In deciding a Rule 12(b)(6) motion to dismiss, a court must view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A court must accept well-pleaded facts as true. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). In deciding a motion to dismiss, a court may consider a written instrument attached to the complaint as an exhibit "if it is central to the plaintiff's

claims and is undisputed in terms of authenticity." *Maxcess, Inc. v. Lucent Techs.,*

*Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005).

## II.

Dr. Zatta alleges that AllStates hired him in October 2020 to work for

AllStates's clients, SCI and Sanmina. (Doc. 104, p. 11, ¶ 25). AllStates signed a

contract with Dr. Zatta's company, Embedded Software & LabView LLC. (Doc.

112-1). Under the contract, Embedded Software agreed to have Dr. Zatta, a "Sr.

Test Engineer / Labview Developer," perform "for AllStates on behalf of

[AllStates's] client," SCI Systems, consulting services for a term of one year. (Doc.

112-1, pp. 2, 8). The contract bears Embedded Software's electronic signature; Dr.

Zatta did not sign the contract. (Doc. 112-1, p. 7).[2]

Dr. Zatta moved from California to Alabama at his own expense to provide

consulting services to SCI. (Doc. 104, p. 14, ¶ 36). AllStates required Dr. Zatta to

pass a pre-employment drug screening. (Doc. 104, p. 12, ¶ 32; Doc. 112-1, p. 3).

Dr. Zatta alleges that AllStates, SCI, and Sanmina instructed him to meet with SCI

and Sanmina's human resources department on his first day of work to attend "New

Employee Orientation" or "New Employee Onboarding Process." (Doc. 104, p. 15,

---

[2] Doc. 104-3 contains a copy of the contract between AllStates and Dr. Zatta's company, Embedded Software & LabView LLC. AllStates has attached a fully executed copy of this contract to its motion to dismiss as Doc. 112-1. Because this contract "is central to" Dr. Zatta's claims "and is undisputed in terms of authenticity," the Court may consider this attachment in resolving AllStates's motion. *See Maxcess*, 433 F.3d at 1340 n.3.

¶ 37). He participated in the trainings and completed the paperwork that SCI and Sanmina required. (Doc. 104, p. 15, ¶ 37). Dr. Zatta alleges that AllStates, SCI, and Sanmina required him to sign and comply with SCI workplace policies. (Doc. 104, pp. 15–16, ¶ 38).

Dr. Zatta alleges that he worked under the supervision of SCI's Director of Test Engineering, Terri Womack. (Doc. 104, p. 17, ¶ 41; *see* Doc. 1, p. 2). Ms. Womack assigned him office space at SCI and a laptop computer. (Doc. 104, p. 17, ¶ 41). Ms. Womack informed Dr. Zatta that he could not work remotely without her permission and required him to submit weekly progress reports on a template used by SCI and Sanmina employees. (Doc. 104, p. 17, ¶ 41). AllStates, SCI, and Sanmina instructed him not to bring his own computers, tools, and equipment into the SCI/Sanmina workplace. (Doc. 104, p. 17, ¶ 42).

The contract between AllStates and Embedded Software contained non-solicitation and non-compete provisions that limited Dr. Zatta's freedom to contract during and after performance of services under the contract. (Doc. 112-1, pp. 3, 6). AllStates could terminate the contract. (Doc. 112-1, p. 4). Dr. Zatta alleges that at the request of Ms. Womack and AllStates, he sent an email to Ms. Womack in which he committed to work for her "for the longer term with the possibility of accepting a full-time permanent employment at SCI." (Doc. 104, p. 26, ¶ 59).

According to Dr. Zatta, AllStates required him to work 40 hours per week or

more like other SCI and Sanmina employees. (Doc. 104, p. 15, ¶ 39). Dr. Zatta alleges that AllStates, SCI, and Sanmina instructed him to submit weekly timecards into the system used by SCI and Sanmina employees. (Doc. 104, pp. 17–18, ¶ 42). AllStates compensated Dr. Zatta at a rate of $100.00 per hour. (Doc. 112-1, p. 8). Dr. Zatta alleges that AllStates told him it would authorize payments only for work approved by Ms. Womack. (Doc. 104, p. 30, ¶ 64; Doc. *see* Doc. 112-1, p. 5). Dr. Zatta alleges that Coretech, a sister company of AllStates "serving [as] a Human Resource Department for [AllStates's] family of companies, made it very clear to" him "that '***You are an employee of ALLSTATES working for our client***.'" (Doc. 104, p. 18, ¶ 45) (bold in amended complaint).[3] According to Dr. Zatta, Coretech instructed him to work with Fusion for payroll services and discussed other "employment benefits" available to him. (Doc. 104, pp. 18–19, ¶ 45).

When a co-employee who acted as if he was Dr. Zatta's immediate supervisor began harassing Dr. Zatta, Dr. Zatta reported the conduct to James Powner, an AllStates employee. (Doc. 104, p. 26, ¶ 59). Dr. Zatta alleges that Ms. Womack occasionally allowed him to work remotely after he complained of discrimination. (Doc. 104, pp. 28, 30, ¶¶ 62, 64). According to Dr. Zatta, he continued to experience discrimination after his initial report, and he reported the ongoing discrimination to

---

[3] The contract between AllStates and Embedded Software states that neither Embedded Software nor Dr. Zatta "[we]re employees of AllStates." (Doc. 112-1, p. 3).

AllStates and to Ms. Womack verbally and in writing.  (Doc. 104, p. 29, ¶ 64).

Dr. Zatta alleges that on March 26, 2021, AllStates called him to inform him that "[Ms. Womack] had made the decision to terminate his employment on March 25, 2021."  (Doc. 104, p. 30, ¶ 65).  AllStates refused to provide a reason for his termination.   (Doc. 104, p. 30, ¶ 65).   Dr. Zatta requested "written notice or confirmation," and AllStates wrote to him on March 29, 2021 that "SCI has elected to end the contract need for your services through All States [sic] effective Thursday, March 25th COB."  (Doc. 104, p. 30, ¶ 65) (emphasis omitted).  A few months later, Sanmina sent Dr. Zatta a letter stating that Ms. Womack "had made the termination of" Dr. Zatta "through" AllStates.  (Doc. 104, p. 35, ¶ 68).  The June 2021 letter indicates that Dr. Zatta was terminated for "poor 'unsatisfactory performance' following an employee job performance review."  (Doc. 104, p. 35, ¶ 68).

### III.

In the initial complaint that Dr. Zatta filed against SCI, Sanmina, and AllStates in 2021, Dr. Zatta alleged Title VII claims, a failure to pay wages claim, and state-law claims.  (Doc. 1).  AllStates moved to dismiss Dr. Zatta's claims.  (Doc. 40).  The Court granted AllStates's motion.  (Doc. 60).  The Court explained that Dr. Zatta could not assert Title VII claims against AllStates because Dr. Zatta did not file a Charge of Discrimination against AllStates with the Equal Employment Opportunity Commission before he sued AllStates.  (Doc. 60, pp. 6–9).  The Court dismissed Dr.

Zatta's failure to pay wages and state-law claims because the contract governing Dr. Zatta's work was between AllStates and Dr. Zatta's company, Embedded Software & LabView, LLC; Dr. Zatta did not have a contract with AllStates.  (Doc. 60, pp. 9–10).

Dr. Zatta asked to amend his complaint to assert a Section 1981 claim against AllStates.  (Doc. 57, p. 10).  The Court denied Dr. Zatta's motion to amend his complaint because Dr. Zatta did not allege "sufficient facts to establish an impaired contractual relationship under which he, in his individual capacity, ha[d] rights vis-à-vis AllStates." (Doc. 77, pp. 15–16; *see also* Doc. 88, pp. 2–3 (citations omitted)). The Court denied Dr. Zatta's motion to reconsider.  (Doc. 88, pp. 4–5).

During a July 2024 telephone hearing with Dr. Zatta and counsel for SCI and Sanmina, Dr. Zatta asked the Court for permission to file an amended complaint against SCI, Sanmina, AllStates, Coretech, and Fusion.  Dr. Zatta explained that he planned to assert claims against the defendants under the FLSA, Title VII, and Section 1981.  Because the Court already had addressed Dr. Zatta's Title VII and Section 1981 claims against AllStates, the Court granted Dr. Zatta leave to amend his complaint to add an FLSA claim against AllStates and to revise his claims against other defendants.[4]  The Court memorialized this discussion with a text order that

---

[4] A transcript of the hearing is available upon request.

gave Dr. Zatta until July 23, 2024 to file an amended complaint.  (Doc. 102).

In his amended complaint, Dr. Zatta asserts nineteen claims.  (Doc. 104). Under the FLSA, he has asserted eight claims against SCI and Sanmina and seven claims against AllStates.  (Doc. 104).[5]  Under Title VII, he has asserted eight claims against SCI and Sanmina and two claims against AllStates.  (Doc. 104).  Under Section 1981, he has asserted five claims against SCI and Sanmina and four claims against AllStates.  (Doc. 104).

## IV.

As noted, during the July 2024 telephone hearing in this matter, the Court gave Dr. Zatta permission to amend his complaint to assert claims against AllStates only under the FLSA.  Rule 41(b) of the Federal Rules of Civil Procedure provides that if "the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."  FED. R. CIV. P. 41(b).  By reasserting claims against AllStates under Title VII and by asserting claims against AllStates under Section 1981, Dr. Zatta has not complied with the Court's instruction.  Accordingly, the Court grants AllStates's motion to dismiss Dr. Zatta's Title VII and Section 1981 claims against the company.

---

[5] Dr. Zatta appears to assert FLSA claims in counts one through seven and in count nineteen.  (Doc. 104, pp. 41–51, 67–69).

# V.

To proceed with his FLSA claims against AllStates, Dr. Zatta must adequately allege that AllStates employed him because the FLSA's protections "extend to 'employees' only." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015). The "determination of employment status under the FLSA is a question of law." *Brouwer v. Metro. Dade Cnty.*, 139 F.3d 817, 818 (11th Cir. 1998) (citation omitted). The FLSA establishes the characteristics of an "employee" under the statute through "a series of broad definitions," none of which "bring 'independent contractors' within the FLSA's ambit." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (citation omitted).[6]

"To determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Scantland*, 721 F.3d at 1311 (quotation and citations omitted). In the Eleventh Circuit, district courts must consider six factors in analyzing the economic realities of an alleged employment relationship. The factors are:

(1) the nature and degree of the alleged employer's control as to the

---

[6] The FLSA defines employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). For the purposes of Dr. Zatta's claims against AllStates, an employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "Employ" means "to suffer or permit to work." 29 U.S.C. § 203(g).

manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Scantland*, 721 F.3d at 1311–12 (quotation omitted). "[T]hese six factors are not exclusive and no single factor is dominant." *Scantland*, 721 F.3d at 1312.

The FLSA's protections extend to "joint employer" or "joint employment" relationships. *Guevara v. Lafise Corp.*, 127 F.4th 824, 831 (11th Cir. 2025). The Eleventh Circuit applies another multi-factor test in determining whether a joint employment relationship exists. *Guevara*, 127 F.4th at 831–32. This test directs district courts to consider eight, non-exclusive "*Aimable* factors." *Guevara*, 127 F.4th at 832 (quotation omitted). Like the employee-independent contractor analysis, "'the ultimate question' when determining whether an entity qualifies as a joint employer under the FLSA 'is whether, as a matter of "economic reality," the

hired individual is "economically dependent" upon the hiring entity.'"  *Guevara*, 127 F.4th at 832 (quotation omitted).[7]

With respect to the control factor, a company resembles an employer when the company "goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work."  *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1178 (11th Cir. 2012) (internal quotation marks and quotation omitted).  The Eleventh Circuit distinguishes "indirect" control from "the type of control exercised by an employer." *Layton*, 686 F.3d at 1178.

In *Layton*, shipping and logistics provider DHL Express, Inc. contracted with a company called Sky Land Express, Inc. to deliver packages.  *Layton*, 686 F.3d at 1173.  Sky Land employed delivery drivers who served DHL under the parties' contract.  *Layton*, 686 F.3d at 1173.  Each day, Sky Land drivers loaded Sky Land trucks with DHL packages for delivery after a DHL employee informed the drivers that the packages "had been received and coded and were ready for pick-up." *Layton*, 686 F.3d at 1173–74.  DHL inspected each driver's truck and uniform.

---

[7] The employee-independent contractor test includes *Aimable* factors one, seven, and eight. *Compare Scantland*, 721 F.3d at 1311–12, *with Guevara*, 127 F.4th at 832.  The other *Aimable* factors are "the degree of supervision, direct or indirect, of the work;" "the power to determine the pay rates or the methods of payment of the workers;" "the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;" "preparation of payroll and the payment of wages;" and "ownership of facilities where work occurred."  *Guevara*, 127 F.4th at 832 (internal quotation marks omitted) (quotation omitted).

*Layton*, 686 F.3d at 1174.  The drivers spent most of their workday picking up and delivering packages and transmitting data about the packages to DHL's server. *Layton*, 686 F.3d at 1174.

In *Layton*, the Eleventh Circuit concluded that the control factor weighed against a finding of economic dependence.  686 F.3d at 1178.  While DHL controlled Sky Land drivers' hours, "DHL did not involve itself with the specifics of how" Sky Land's drivers achieved DHL's delivery and customer service "objectives." *Layton*, 686 F.3d at 1178.  DHL "did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the chain of command." *Layton*, 686 F.3d at 1178.

In *Scantland*, Jeffry Knight, Inc. contracted with technicians to install and repair cable, internet, and phone services for Bright House Networks.  721 F.3d at 1310.  The defendant "controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and closely monitored the quality of their work." *Scantland*, 721 F.3d at 1315.  Knight required workers to arrive at its facilities each morning and to work between five and seven days per week. *Scantland*, 721 F.3d at 1313, 1315.  Workers submitted work orders with billing codes that Knight set. *Scantland*, 721 F.3d at 1313.  Knight provided each day's work orders to the

12

technicians, and the technicians could not decline a work order without threat of repercussions. *Scantland*, 721 F.3d at 1313. Knight assigned technicians to quality control meetings, new equipment classes, and monthly equipment inventories. *Scantland*, 721 F.3d at 1313–14. Knight had to approve additional services sold to customers by technicians. *Scantland*, 721 F.3d at 1314. Knight prevented technicians from working for other companies. *Scantland*, 721 F.3d at 1314. Knight monitored technicians through dispatch and a mobile phone application. *Scantland*, 721 F.3d at 1314. Knight performed site checks of technicians' work, and Knight tracked technicians' quality. *Scantland*, 721 F.3d at 1314. Knight could terminate technicians. *Scantland*, 721 F.3d at 1314.

Here, under the terms of AllStates contract with Embedded Software, Dr. Zatta provided services to SCI as a "Sr. Test Engineer / Labview Developer." (Doc. 104, pp. 11, 14, ¶¶ 25, 36; Doc. 112-1, pp. 2, 8). Dr. Zatta alleges that AllStates and SCI required him to work 40 hours per week "on the premises of SCI at all times." (Doc. 104, p. 28, 15, ¶ 61; *see also* Doc. 104, p. 16, ¶ 39). Dr. Zatta alleges that AllStates, SCI, and Sanmina, required him to attend training as needed. (Doc. 104, pp. 15, 18, ¶¶ 38, 43). The contract between Embedded Software and AllStates contains non-solicitation and non-compete provisions that limited Dr. Zatta's freedom to contract during and after the contract term. (Doc. 112-1, pp. 3, 6).

Dr. Zatta does not allege that AllStates maintained control of his day-to-day

activities.  (*See* Doc. 104, p. 15, ¶ 37).  In his complaint, Dr. Zatta provides little information about the specific work that he performed for SCI, and the contract between AllStates and Embedded Software refers generally to consulting services. (Doc. 112-1, p. 8).  Dr. Zatta alleges that Ms. Womack at SCI supervised his work and that she was "manager of all employees of SCI involved in testing hardware or developing software for testing hardware."  (Doc. 104, p. 17, ¶ 41).  Dr. Zatta alleges that his "key assignment" was software development, and he states that the software that he developed at SCI "work[ed] perfectly."  (Doc. 104, pp. 24, 26, ¶¶ 55, 58). Though the details of his work are not clear, Dr. Zatta was involved in the development of software and the testing of hardware for SCI.  Dr. Zatta does not allege that AllStates dictated the way in which he developed software for SCI.

In finding that the control factor weighed in favor of classifying Mr. Scantland as an employee, the Eleventh Circuit focused on the fact that Knight maintained significant control on the technicians' day-to-day work.  *See Scantland*, 721 F.3d at 1315.  In contrast, "DHL did not involve itself with the specifics of how" Sky Land's drivers achieved DHL's delivery and customer service "objectives."  *Layton*, 686 F.3d at 1178.  Because Dr. Zatta does not allege that AllStates exercised control over the way in which he developed software or tested hardware for SCI, AllStates's control is best described as "indirect" and not "overly active."  *See Layton*, 686 F.3d at 1178 (internal quotation marks and quotation omitted).  Indeed, Dr. Zatta has not

alleged that AllStates played more than a passive role in directing his work at SCI. *See Layton*, 686 F.3d at 1178 (citation omitted). Therefore, Dr. Zatta's relationship with AllStates is more akin to the relationship between DHL and Sky Land's drivers. The control factor does not support a finding of economic dependence.[8]

With respect to factors concerning compensation, AllStates's contract with Embedded Software states that payments per approved timecards would be addressed to Embedded Software. (Doc. 112-1, p. 5). Mr. Zatta alleges that "weekly payments" were made "via direct deposits," (Doc. 104, p. 18, ¶ 42), but he does not allege whether payments went into a personal account or an Embedded Software business account. Under the contract, the rate of pay was $100.00 per hour. (Doc. 112-1, p. 8). Dr. Zatta alleges that AllStates and SCI instructed him to submit weekly timecards using the timecard system that "regular employees of SCI" used. (Doc.

---

[8] Analysis of the *Amiable* factor concerning direct or indirect supervision of Dr. Zatta's work follows the same path. *See Guevara*, 127 F.4th at 832 (citation omitted). "[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Layton*, 686 F.3d at 1179 (brackets in *Layton*) (internal quotation marks omitted) (quotation omitted). In *Layton*, the drivers spent most of their time away from DHL's facilities and employees. 686 F.3d at 1179. While DHL "engaged in a limited amount of monitoring at the warehouse, [the] Drivers were basically unsupervised while completing their most essential job function." *Layton*, 686 F.3d at 1179. Based on these facts, the Eleventh Circuit concluded that this level of supervision did not support a finding of economic dependence. *Layton*, 686 F.3d at 1179.

As with the control factor, Dr. Zatta has not alleged that AllStates supervised his most essential job function of developing software or testing hardware. Dr. Zatta alleges that AllStates told him "to avoid requesting permissions to work from home," (Doc. 104, p. 28, ¶ 62), but that sort of ministerial oversight is not the sort of supervision that lends itself to a finding of economic dependence. Because Dr. Zatta has alleged only that AllStates "engaged in a limited amount of monitoring" of his work, *Layton*, 686 F.3d at 1179, the supervision factor does not support classifying Dr. Zatta as an employee of AllStates.

104, p. 18, ¶ 42). The AllStates/Embedded Software contract contains the same requirement. (Doc. 112-1, p. 5). Ms. Womack approved Dr. Zatta's time, per the AllStates/Embedded Software contract requirement. (Doc. 104, pp. 18, 30, ¶¶ 42, 64; Doc. 112-1, p. 5).

Dr. Zatta interacted with Coretech, AllStates's sister company, for human resources matters, and Coretech directed Dr. Zatta to consult with Fusion for payroll services and employment benefits. (Doc. 104, pp. 18–19, ¶ 45). Dr. Zatta alleges that Coretech informed him that he "[was] an employee of ALLSTATES working for [its] client," (Doc. 104, p. 18, ¶ 45) (emphasis omitted) (internal quotation marks omitted), but the contract between AllStates and Embedded Software states that neither Embedded Software nor Dr. Zatta "[we]re employees of AllStates." (Doc. 112-1, p. 3). Dr. Zatta paid for travel and business expenses that were not billable to SCI. (Doc. 112-1, p. 4). He did not receive holiday pay. (Doc. 104, p. 25, ¶ 58). Taken together, these facts are neutral.

With respect to AllStates's ability, "directly or indirectly, to hire, fire, or modify the employment conditions of the workers," *Guevara*, 127 F.4th at 832 (internal quotation marks and quotation omitted), AllStates contracted Dr. Zatta, through Embedded Software, to work for SCI. AllStates required Dr. Zatta to pass a pre-employment drug screening. (Doc. 104, p. 12, ¶ 32). AllStates could terminate the contract between AllStates and Embedded Software. (Doc. 112-1, p. 4). Dr.

Zatta alleges that AllStates informed him of SCI's decision to terminate his services. (Doc. 104, p. 30, ¶ 65). A letter concerning the termination of services states that Ms. Womack at SCI made the decision to terminate Dr. Zatta's services "through" AllStates. (Doc. 104, p. 35, ¶ 68).

In *Layton*, "DHL's only involvement with Sky Land's hiring process was that . . . all persons . . . had to pass a basic background check. DHL did not participate in the actual hiring or firing of any employees." 686 F.3d at 1179. As a result, the Eleventh Circuit concluded this factor weighed against a finding of economic dependence. *Layton*, 686 F.3d at 1179. Dr. Zatta's allegations establish that AllStates played a more significant role in contracting with Embedded Software and in terminating Dr. Zatta's services at SCI. This factor somewhat supports a finding of economic dependence at this stage of the litigation.

With respect to "the alleged employee's opportunity for profit or loss depending upon his managerial skill," *Scantland*, 721 F.3d at 1316, the Eleventh Circuit explained in *Scantland*:

> Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work . . . . An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business. As the Supreme Court has explained, a job whose profits are based on efficiency is "more like piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor.

17

721 F.3d at 1316–17 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

Here, Mr. Zatta has not alleged that had the ability to earn anything other than the $100 per hour fee set in AllStates's contract with Embedded Software. (Doc. 112-1, p. 8). The contract does not mention incentive bonuses based on skill. (*See* Doc. 112-1). To be sure, a software engineer like Dr. Zatta relies upon initiative, judgment, and foresight to perform services, but Dr. Zatta has not alleged facts that suggest that he had the power to generate income beyond the hourly wage secured by Embedded Software's contract with AllStates. In fact, he alleges that his Christmas vacation was unpaid, likely because he did not work over the holidays. (Doc. 104, p. 25, ¶ 58). This factor weighs in favor of finding an employer/employee relationship.

With respect to the equipment investment factor, when "there seems to be little need for significant independent capital," "this factor weighs in favor of independent contractor status, [but] the weight in that direction is minimal." *See Scantland*, 721 F.3d at 1317–18. Here, Dr. Zatta alleges that SCI supplied a laptop for him to use at SCI, and he asserts that SCI and AllStates instructed him that he could not use his own laptop while he worked at SCI. (Doc. 140, p. 17, ¶ 42). Dr. Zatta also complains that after his direct supervisor harassed him, Ms. Womack would not authorize him to work from home several days a week, "forc[ing] [him]

18

to give up on any plans to work from home in spite of the heavy investments he made for working from home using his own computer, additional equipment, test instruments, tools, and hardware brought from California and purchased while in Alabama." (Doc. 140, p. 28, ¶ 62). Mr. Zatta alleges that between March 5, 2021 and March 19, 2021, Ms. Womack authorized him to work from home occasionally, but she refused to "approve all hours of work" Dr. Zatta performed at home. (Doc. 140, p. 30, ¶ 64). Though Dr. Zatta could not control the number of hours he worked remotely, he could choose to work from home approximately three days per week until shortly before SCI terminated his services, and he invested in the equipment and tools he needed for remote work. (Doc. 104, p. 28, ¶ 62).

The contract between AllStates and Embedded Software required Embedded Software to obtain automobile insurance, general liability insurance, and worker's compensation insurance. (Doc. 112-1, pp. 5–6). Dr. Zatta relocated from California to Huntsville at his own expense. (Doc. 104, p. 14, ¶ 36).

Based on Mr. Zatta's allegations and Embedded Software's obligations under its contract with AllStates, this factor does not weigh in favor of classifying Dr. Zatta as an employee of Allstates because Mr. Zatta invested in his own equipment, and he used SCI equipment when he worked there. Embedded Software's obligation to secure insurance also signals an independent contractor relationship.

As to the nature of the work Dr. Zatta performed, the service he rendered to

19

SCI "require[d] a special skill." *Scantland*, 721 F.3d at 1318.  Mr. Zatta alleges that he brought to SCI "22 years of direct work experience in [s]oftware."  (Doc. 104, p. 23, ¶ 54).  Dr. Zatta alleges that he earned a Ph.D degree, and he was a software engineer.  (Doc. 104, p. 24, ¶ 54).  He alleges that "[n]one of the regular employees of SCI . . . had the knowledge, skills or work experience to develop the software that was the key assignment of PLAINTIFF."  (Doc. 104, p. 24, ¶ 55).  Dr. Zatta also alleges that he "was brought in from California because of [his] unique set of skills and outstanding record of achievements."  (Doc. 104, p. 24, ¶ 55).  Dr. Zatta alleges that his "extensive work experience in software" includes "successfully programming and flying the U.S. Navy MQ-8B drone helicopters, developing software to test open-heart surgery equipment, testing Airbus A350 aircraft subsystems and many more."  (Doc. 104, p. 25, ¶ 57).

These allegations indicate that Dr. Zatta possessed skills that made him uniquely qualified to perform the services he supplied to SCI through Embedded Software's contract with AllStates.  Therefore, this factor weighs in favor of classifying Dr. Zatta as an independent contractor.

"The degree of permanency and duration of the working relationship" factor also indicates that Dr. Zatta worked at SCI as an independent contractor.  *Scantland*, 721 F.3d at 1318.  In *Scantland*, "[t]his factor point[ed] strongly toward employee status" when the "plaintiffs worked for [the defendant] for an average of more than

five years" and when "[t]heir contracts were for year terms, were automatically renewed, and were terminable only with thirty days' notice." 721 F.3d at 1318.

Under Embedded Software's contract with AllStates, Dr. Zatta had a one-year assignment terminable with thirty days' notice. (Doc. 112-1, pp. 4, 8). Unlike the employees in *Scantland*, Dr. Zatta's term did not automatically renew, and he worked at SCI for less than one year before SCI terminated his services. (*See* Doc. 104, pp. 11, 30, ¶ 25, 65; Doc. 112-1, p. 4). Dr. Zatta alleges that, at Ms. Womack's request, he sent her an email to commit to work for her "for the longer term with the possibility of accepting a full-time permanent employment at SCI." (Doc. 104, p. 26, ¶ 59). That Dr. Zatta might take a full-time job with SCI at a future date suggests that he did not have an employment relationship with AllStates. Therefore, this factor weighs in favor of independent contractor status.

Considering "the extent to which the service rendered is an integral part of the alleged employer's business," *Scantland*, 721 F.3d at 1319, because AllStates is a staffing agency, (Doc. 104, p. 7, ¶ 13), Dr. Zatta's services were an important part of AllStates's ability to serve its client, SCI. But as a staffing agency, AllStates was in the business of supplying staff for its clients, not employing staff itself. On balance, in this case, this factor is neutral.

Thus, of the factors discussed, only two weigh significantly in favor of classifying Dr. Zatta as an employee of AllStates. Most of the economic dependence

factors support categorizing Dr. Zatta as an independent contractor rather than as an employee of AllStates.[9]   Therefore, Dr. Zatta has not alleged facts sufficient to regard him as an employee of AllStates under the FLSA.   The Court will grant AllStates's motion and dismiss Dr. Zatta's FLSA claims against the company.

## VI.

Under Rule 4 of the Federal Rules of Civil Procedure, after a plaintiff files a lawsuit, the plaintiff "is responsible for having the summons and complaint served [on the defendants] within the time allowed by Rule 4(m)."  FED. R. CIV. P. 4(c)(1). Rule 4(m) requires service "within 90 days after the complaint is filed."  FED. R. CIV. P. 4(m).  If a plaintiff does not serve defendants within this 90-day period, then the district court, "on motion or on its own after notice to the plaintiff," "must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  FED. R. CIV. P. 4(m).  "[I]f the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."  FED. R. CIV. P. 4(m).

On July 22, 2024, Dr. Zatta filed his amended complaint and named as defendants Coretech, LLC and Fusion Solutions, Inc.  (Doc. 104).  The Clerk of Court did not issue summons to Dr. Zatta for service on Coretech, LLC and Fusion

---

[9] For the same reasons, if SCI or Sanmina employed Dr. Zatta, AllStates does not qualify as a joint employer.

Solutions, Inc. until September 10, 2024. (Doc. 114).[10] Dr. Zatta's window to serve Coretech and Fusion closed on October 21, 2024. To date, Dr. Zatta has not served Coretech and Fusion.

In his request for judicial notice, Dr. Zatta explains that he has not served Coretech and Fusion because Coretech's and Fusion's agents "[we]re rejecting process service for PLAINTIFF having not used their legal names." (Doc. 117, p. 3). According to Dr. Zatta, "[a]gents for process and services [we]re claiming that Coretech, LLC and Fusion Solutions, Inc are fictitious names used for the sole purpose of conducting business." (Doc. 117, p. 3). Dr. Zatta asserts that "[a]gents for process of service for Coretech, LLC and Fusion Solutions, Inc. are firmly requiring that PLAINTIFF amend his [first amended complaint], that PLAINTIFF use their legal names and their other names Coretech, LLC and Fusion Solutions, Inc as 'Also Known As or AKA' names." (Doc. 117, p. 4).

In its motion to dismiss, AllStates states that "AllStates and Fusion Solutions, Inc., are unfamiliar with any entity known as 'CoreTech, LLC.'" (Doc. 112, p. 1 n.1). In its reply brief, AllStates states that Dr. Zatta has clarified that "he intended to name CoreTech Consulting, LLC, rather than CoreTech, LLC." (Doc. 116, p. 2 n.1). Dr. Zatta has alleged that Coretech, Fusion, and AllStates have a relationship

---

[10] Dr. Zatta did not contribute to the delay. He timely mailed the summons forms to the Clerk and followed-up on the forms' status. (*See* Doc. 115, pp. 7–8; Doc. 115-4; Doc. 115-5; Doc. 115-6).

with one another.  (Doc. 104, pp. 18–19, ¶ 45).

Based on this information, it appears that Dr. Zatta potentially could serve the Coretech and Fusion defendants, but doing so would be futile because Dr. Zatta has not included substantive allegations concerning either defendant in the claims he asserted in his amended complaint.  (Doc. 104, pp. 41–69).  Dr. Zatta labels several of his FLSA claims as claims against "all defendants," and he mentions Fusion specially in the label of one FLSA claim, (Doc. 104, pp. 41–47), but Dr. Zatta has not alleged that he qualifies as an employee of Fusion or Coretech, and he makes no specific allegation against either defendant from which the Court may infer either defendant's participation in the FLSA violations that Dr. Zatta alleges.  To the extent Dr. Zatta makes specific allegations in the FLSA counts in which he has named all defendants, he does so against AllStates, SCI, and Sanmina.  (*See* Doc. 104, pp. 41–47).  Because Dr. Zatta has not asserted a substantive claim for relief against Fusion or Coretech, the service issue is moot.

## VII.

Accordingly, the Court grants AllStates's motion to dismiss.  The Court takes judicial notice of the reasons why Dr. Zatta has not served the Coretech and Fusion defendants but declines to offer Dr. Zatta an opportunity to perfect service on these entities.  The Court dismisses Dr. Zatta's claims against Coretech and Fusion without prejudice for failure to state a claim.

24

On or before April 30, 2025, Dr. Zatta and counsel for SCI and Sanmina shall please confer and submit to the Court a proposed scheduling order governing Dr. Zatta's claims against SCI and Sanmina.

The Clerk shall please TERM Doc. 112 and Doc. 117. The Clerk shall please TERM AllStates, Coretech, and Fusion as defendants in this case.

**DONE** and **ORDERED** this March 26, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE